IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HARVARD SAVINGS BANK; HARVARD ILLINOIS BANCORP, INC., | ) ) ) |
| Plaintiffs, | ) Court No. 15-cv-11674 ) ) Assigned Judge: Hon. Charles R. Norgle |
| v. | ) ) Magistrate: Hon. Geraldine Soat-Brown |
| SECURITY NATIONAL INSURANCE COMPANY, | ) ) ) |
| Defendant. | ) |

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT ON COUNTS I, II AND VI OF HARVARD'S
FIRST AMENDED COMPLAINT AND ON COUNTS I, II AND VI
OF SECURITY NATIONAL'S SECOND AMENDED COUNTERCLAIM**

Defendant, Security National Insurance Company ("Security National"), submits this Memorandum Brief in Support of its Motion for Partial Summary Judgment against Plaintiffs, Harvard Savings Bank ("HSB") and Harvard Illinois Bancorp, Inc. ("HIB") (collectively "Harvard"), on Counts I, II and VI of Harvard's First Amended Complaint for Declaratory Relief and Damages (Doc. #16) and on Counts I, II and VI of Security National's Second Amended Counterclaim (Doc. #31), based on Harvard's inability to prove coverage under Insuring Agreements D(1), D(3) and E(3).

**I.     PRELIMINARY STATEMENT**

This lawsuit arises from a fraudulent loan scheme allegedly perpetrated by a Florida company and at least one of its owners. Harvard's investment manager purchased portions of twenty-five (25) United States Department of Agriculture ("USDA") guaranteed rural development loans. However, the loans were entirely fabricated and neither the borrowers nor the transactions referenced in the documents exist. Harvard seeks to recover its alleged losses under a Financial Institution Bond (the "Bond") issued by Security National.

Under Insuring Agreements D(1), coverage is available only where Harvard can establish that it suffered loss resulting directly from forgery or alteration of a "Negotiable Instrument" as defined in the Bond. Under Insuring Agreements D(3), coverage is available only where Harvard can establish that it suffered loss resulting directly from the receipt of a Counterfeit "Negotiable Instrument." To meet the definition of a "Negotiable Instrument," Harvard must prove each of the elements of the definition, including the requirement that the allegedly qualifying document contain an "unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer…" Because there can be no dispute that the fraudulent loan documents do not contain an unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer, Harvard cannot meet its burden of proof under Insuring Agreements D(1) or D(3) of the Bond. Security National is therefore entitled to summary judgment on Counts I and II of Harvard's First Amended Complaint and Counts I and II of Security National's Second Amended Counterclaim.

Under Insuring Agreements D(3) and E(3) of the Bond, coverage is available only where a "Counterfeit" instrument imitates an actual, valid original document relating to the specified transaction. It is not enough for a document to be fake – the document must imitate a real, existing authentic original document. The Seventh Circuit and courts across the country have repeatedly and consistently concluded, as a matter of law, that a document which is not an imitation of an actual, authentic and genuine original instrument involving the borrower and the transaction is not a "Counterfeit." Security National is therefore entitled to summary judgment on Counts II and VI of Harvard's First Amended Complaint and Counts II and VI of Security National's Second Amended Counterclaim.

2

II.      UNDISPUTED FACTS

    A.      The Bond

Security National issued the Bond to HIB for the bond period June 22, 2014 to June 22, 2015.[1] In Count I, Harvard alleges that coverage exists under Insuring Agreement D(1) in the Bond, which provides coverage for loss "resulting directly from" "Forgery or alteration of, on or in any Negotiable Instrument..."[2] A "Negotiable Instrument" is defined as "any writing (1) signed by the maker or drawer, and (2) containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer, and (3) is payable on demand or at a definite time, and (4) is payable to order or bearer."[3]

In Count II, Harvard alleges coverage under Insuring Agreement D(3) in the Bond, which provides coverage for loss "resulting directly from" "the receipt by the Insured, in good faith, of any Counterfeit Negotiable Instrument."[4] In Count VI, Harvard alleges coverage under Insuring Agreement E(3) in the Bond, asserting that it extended credit based on certified securities which were counterfeit.[5] Insuring Agreement E contains seven distinct requirements: (1) the Insured sustained a "loss"; (2) the loss involved a type of document covered by Insuring Agreement E which was an "Original"; (3) the "Original" document was forged, counterfeit, altered, lost or stolen, as those terms are defined in Insuring Agreement E; (4) the Insured relied on the defective, "Original" document in making a loan or advancing funds; (5) the Insured had "actual physical possession" of the covered, "Original" document, which is a condition precedent to establishing reliance; (6) the Insured's reliance was in good faith; and (7) the loss directly resulted from the

---

[1] Statement of Material Facts at ¶ 1.
[2] Plaintiffs' First Amended Complaint (Doc. #16) at ¶¶ 1, 25, 28, 34, 40-44.
[3] Statement of Material Facts at ¶ 2.
[4] Plaintiffs' First Amended Complaint (Doc. #16) at ¶¶ 1, 25, 29, 35, 45-49.
[5] *Id.* at ¶¶ 1, 25, 34, 35, 65-68.

3

facts established in requirements (1) through (6).[6] "Counterfeit" is defined as "an imitation which is intended to deceive and be taken as an Original."[7] An "Original" is defined in relevant part as "[t]he first rendering or archetype and does not include photocopies or electronic transmissions even if received and printed."[8]

Pennant Management, Inc. ("Pennant") and HSB entered into an Investment Advisory Agreement pursuant to which Pennant was to provide services as an investment advisor.[9] On May 9, 2013, Pennant and First Farmers Financial, LLC ("FFF") entered into a Master Repurchase Agreement ("Repo B Agreement"), for purposes of purchasing the USDA guaranteed portions of loans pursuant to the USDA Business and Industry (B&I) Guaranteed Loan Program.[10] Under the B&I Guaranteed Loan Program, the USDA guarantees a portion of business loans for rural development projects.[11] The Assets under the Repo B Agreement included the guaranteed portions of the USDA B&I loans and all the applicable promissory notes underlying such USDA guarantees.[12]

FFF purported to have originated loans under the B&I Guaranteed Loan Program.[13] On October 17, 2014, HSB provided notice of a loss under the Bond, stating that it had an interest of $18,084,796.74 in twenty-six (26) loans originated by FFF and sold under the Repo B Agreement between FFF and Pennant.[14] Pennant informed Harvard that at least three of the twenty-six FFF

---

[6] Statement of Material Facts at ¶ 2.
[7] *Id*.
[8] *Id*.
[9] *Id*. at ¶ 3.
[10] *Id*. at ¶ 4.
[11] *Id*. at ¶ 6.
[12] *Id*. at ¶ 5.
[13] *Id*. at ¶ 7.
[14] *Id*. at ¶ 8.

4

loans contained signatures of non-existent borrowers and forged guarantees.[15] Pennant later advised Harvard that the same issues were present with the other twenty-three FFF Loans.[16]

On February 6, 2015, Harvard provided information as part of its Proof of Loss, sworn to under oath by HSB's President, Don Claussen.[17] Harvard's Proof of Loss stated as follows:

> The forgeries giving rise to this claim are forged signatures on loans purportedly guaranteed by the United States Department of Agriculture, which loans were originated by First Farmers Financial, LLC, and sold under a Master Repurchase Agreement to Pennant Management, Inc. as agent for and on behalf of its clients, one of which is Harvard Savings Bank…[18]

The Proof of Loss also stated that Pennant had "determined that the borrowers on and the collateral documents for the loans were non-existent and the loan and collateral documents contained the signatures of non-existent entities and persons."[19] Further, the USDA had "disavowed knowledge of the subject loans and asserted there were no USDA guarantees in existence for the loans."[20]

Harvard's Proof of Loss also adopted and incorporated certain allegations in the First Amended Complaint in an action captioned *Pennant Management, Inc. v. First Farmers Financial, LLC, et al.*, No. 14 C 7581, United States District Court for the Northern District of Illinois ("Pennant Lawsuit").[21] The Pennant Lawsuit was filed in an effort to recover funds from FFF based on the fraudulent loans. In particular, Harvard's sworn Proof of Loss incorporates the following paragraphs from Pennant's First Amended Complaint:

> 30. Until September 18, 2014, Pennant, as the purchaser and beneficial owner of the FFF Loans, had no notice or knowledge that those loans were anything other than bona fide obligations of legitimate borrowers with legitimate, enforceable USDA guarantees. Nor did Pennant have any notice or knowledge that FFF was anything other than a legitimate, USDA-approved lender that was dutifully originating and then servicing

---

[15] *Id*. at ¶ 9.
[16] *Id*.
[17] *Id*. at ¶ 10.
[18] *Id*. at ¶ 11.
[19] *Id*. at ¶ 13.
[20] *Id*.
[21] *Id*. at ¶¶ 12-13.

the FFF Loans and remitting principal and interest payments from borrowers as they were received.

31. In the days immediately preceding September 18, 2014, during a routine review of the documentation regarding the FFF Loans, inconsistencies came to light. Those inconsistencies triggered a more thorough review.

32. Pennant's review ultimately revealed that none of the 26 borrowers reflected in the FFF Loans exists; any identifying information, including postal addresses, either did not exist at all, or had nothing to do with the purported borrower. Nor were Pennant employees able to find any such business entities in Georgia or Florida, the two states in which all of the "borrowers" were purportedly located. Although each of the borrowers purported to be organized under the laws of either Florida or Georgia, both states have confirmed they have no record of any of the purported borrower LLC's as having been organized there. Certificates issued by the Secretary of State of Florida or Georgia so confirming the non-existence of these purported borrowers are attached hereto as Group Exhibit CC.

33. Pennant's review also revealed that the CPA who allegedly performed the most recent audit of FFF, and whose audited financial statement was provided to Pennant, does not exist. Pennant's review also determined that the Uniform Resource Locator web address, or "URL", for the e-mail address provided for the alleged CPA is associated with one of the Patel Entities.

34. On September 18, 2014, the USDA Athens, Georgia office out of which many of these FFF Loans were approved, and from which the related guarantees were purportedly issued, confirmed that it has no record of three randomly selected FFF Loans. A copy of the communication in which the USDA confirmed that fact is attached as Exhibit DD.

35. The USDA has since confirmed that none of the 26 loans described in paragraph 26 was approved by it, nor are any of the notes and related USDA guarantees reflected in its books and records, and has denied Pennant's claim for payment on the purported USDA guarantees of the FFF Loans.[22]

Harvard's sworn Proof of Loss also relies on and incorporates Exhibits A through Z to Pennant's First Amended Complaint, which include copies of the loans and guarantees originated by FFF.[23] Harvard's sworn Proof of Loss further relies on and incorporates other exhibits to Pennant's First Amended Complaint wherein Pennant confirms the non-existence of each

---

[22] *Id.* at ¶ 14.
[23] *Id.* at ¶ 15.

purported borrower for each of the twenty-six FFF loans and the USDA's determination that the loan guarantees do not exist.[24]

### III. LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

Interpretation of an insurance policy is a question of law properly decided on a motion for summary judgment. *BASF AG v. Great American Assur. Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008). The court must construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Id*. at 819. Under Illinois law, "the burden is on the insured to prove that its claim falls within the coverage of an insurance policy." *Lakeshore Sail Charters, LLC v. Acadia Ins. Co.*, 2016 WL 861218, *8 (N.D. Ill. Mar. 7, 2016) (citing Addison Ins. Co. v. Fay, 905 N.E.2d 747, 752 (Ill. 2009). Therefore, Harvard has the burden to prove that its claim falls within the coverage of Bond, including satisfaction of the defined terms "Negotiable Instrument" and "Counterfeit."

Where standard policy terms acquire an established legal meaning, they will be interpreted in accordance with that meaning. *Gee v. State Farm Fire & Cas. Co.*, 2013 WL 8284483, *4 (N.D. Ill. May 29, 2013) (citing *Ace American Ins. Co. v. RC2 Corp., Inc.*, 600 F.3d 763, 767 (7th Cir. 2010)). In bond cases, where the undisputed facts show a document is not a counterfeit within the

---

[24] *Id*. at ¶¶ 16-17.

7

meaning of the bond, the bond carrier is entitled to summary judgment as a matter of law. *See, e.g.*, *Capitol Bank of Chicago v. Fid. & Cas. Co. of New York*, 414 F.2d 986, 989 (7th Cir. 1969).

IV. <u>**ARGUMENT**</u>

    A. <u>**There is No Coverage Under Insuring Agreements D(1) or D(3) of the Bond**</u>

Harvard's First Amended Complaint in Count I alleges coverage under Insuring Agreement D(1). (Doc. #16 at ¶¶ 40-44.) To establish coverage under Insuring Agreement D(1), Harvard must prove, among other things, that it suffered a loss "resulting directly from" "Forgery or alteration of, on or in any Negotiable Instrument..." Similarly, to establish coverage under Insuring Agreement D(3), Harvard must prove that it suffered a loss "resulting directly from … the receipt by the Insured, in good faith, of any Counterfeit Negotiable Instrument." A "Negotiable Instrument" is defined as "any writing (1) signed by the maker or drawer, and (2) containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer, and (3) is payable on demand or at a definite time, and (4) is payable to order or bearer."[25] Because Harvard cannot prove the existence of an unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer as required under sub-paragraph (2) of the definition of a Negotiable Instrument, Security National is entitled to summary judgment that there is no coverage under Insuring Agreements D(1) and D(3).[26]

---

[25] Note that the definition of Negotiable Instrument in the Bond is narrower than the Uniform Commercial Code definition of a negotiable instrument. The Bond definition requires an unconditional promise or order to pay a sum certain in Money and *no other promise, order, obligation or power*." By contrast, a document may still be a negotiable instrument under the UCC where it contains obligations in addition to the unconditional promise to pay a sum certain. *See* U.C.C. § 3-104(a) and § 3-106(b).

[26] Security National reserves the right to assert all defenses to coverage under the Bond, including other coverage defenses with respect to Insuring Agreements D(1), D(3), E(3) and all other insuring agreements under which Harvard asserts coverage. Nothing herein is or should be interpreted as a waiver of any other defense to coverage not identified in this motion.

Each of the fraudulent transactions at issue here followed essentially the same pattern. Pennant and HSB entered into an Investment Advisory Agreement pursuant to which Pennant was to invest HSB's funds. Pennant and FFF entered into the Repo B Agreement, whereby FFF originated loans under the USDA B&I Guaranteed Loan Program and sold the portions of the loans guaranteed by the USDA to Pennant for the benefit of HSB and other investors. The specific Assets to be purchased under the Repo B agreement included USDA Assignment Guarantee Agreements, USDA Loan Note Guarantees and the guaranteed portions of associated Term Notes. Copies of these documents are attached as Exhibits A through Z to the First Amended Complaint in the Pennant Lawsuit.[27] Harvard asserts that all of the FFF transactions were wholly fraudulent.

None of the Assignment Guarantee Agreements, Loan Note Guarantees or Term Notes involved in the FFF transactions are unconditional promises or orders to pay a sum certain in Money and no other promises, orders, obligations or powers.

As an initial example consider the fabricated Assignment Guarantee Agreement, Loan Note Guarantee and Term Note for the fraudulent loan involving OHM Investments, LLC.[28] The Term Note for the OHM loan specifically references "USDA Loan Identification Number 10-038-384701295." That same Loan Identification Number appears on the OHM Assignment Guarantee Agreement and OHM Loan Note Guarantee. That make sense, because a note under the B&I Guaranteed Loan Program depends on and is only originated based on the USDA guarantee. *See* 7 CFR § 4279 *et seq*. When an instrument is executed at the same time as another writing and is part of the same transaction they must be read together as a single agreement. *See, e.g., Krilich v. Millikin Mortgage Co.*, 554 N.E.2d 422, 422, 426 (Ill. App. 1990). As such, the Assignment

---

[27] *See* Statement of Material Facts at ¶ 15 and Exhibit 3 to the Snow Affidavit.
[28] *See* Group Exhibit A to the Pennant First Amended Complaint, a copy of which is included in Exhibit 3 to the Snow Affidavit.

9

Guarantee Agreement, Loan Note Guarantee and Term Note for the OHM loan must be read as a single instrument to determine negotiability. Read together it is clear that the Term Note is expressly conditioned on the USDA's guarantee of the loan and, therefore, there is no unconditional promise or order to pay a sum certain in Money and no other promises, orders, obligations or powers.

Even if the Assignment Guarantee Agreement, Loan Note Guarantee and Term Note are read separately, however, it is equally clear that they do not satisfy the definition of a Negotiable Instrument. The Term Note for the OHM loan includes multiple promises, orders, obligations and powers in addition to the promise to pay, including, for example:

- Gives the Lender the power to designate the interest rate under certain conditions.[29]

- Incorporates loan covenants from and secures the loan by a "Mortgage, Assignment of Leases and Rents and Security Agreement."

- Gives the Lender the power to accelerate the loan in the event of default.[30]

- Requires payment of "reasonable attorneys' fees" by the Maker.[31]

- Provides indemnity against tax obligations.[32]

- Provides notice and other conditions to the declaration of default on the loan or prepayment of the loan.

Any one of these promises, orders, obligations and powers, standing alone, is sufficient to preclude the OHM Term Note from qualifying as a Negotiable Instrument as defined in the Bond.

---

[29] "If the Prime Rate is discontinued as a standard or becomes unascertainable, the Lender shall designate in writing to the Maker a comparable reference rate."
[30] "If an Event of Default shall occur hereunder as defined in the Loan Documents, then at the option of the Lender, the entire principal sum then remaining unpaid and accrued interest thereon shall immediately become due and payable without notice or demand, or in the case of certain Events of Default set forth in the Loan Documents, the entire principal sum and interest accrued thereon shall become automatically due and payable, and in any case, the Interest Rate shall immediately increase to the Default Rate."
[31] "In the event this Note, or any part hereof, is collected by and through an attorney-at-law, Maker agrees to pay all costs of collection including, but not limited to, reasonable attorneys' fees."
[32] "All parties liable for the payment of this Note agree … to indemnify and hold the Lender harmless against liability for the payment of state intangible, documentary and recording taxes, and other taxes (including interest and penalties, if any) which may be determined to be payable with respect to this Term Note and related transaction."

It is also important to note that the entire Term Note is not assigned, but only the USDA "guaranteed portion."

The Loan Note Guarantee for the OHM loan is not an "unconditional promise or order to pay a sum certain in Money" within the definition of a Negotiable Instrument. The Loan Note Guarantee sets forth a number of conditions on the United States' payment obligation. For example, prior to the USDA's obligation to purchase the guaranteed portion of the loan, the Holder must provide the USDA with "evidence of its right to require payment from USDA."[33] Thereafter, the USDA must notify the Lender of its receipt of the Holder's demand for payment and any discrepancy between the amount claimed by the Holder and the information submitted by the Lender must be resolved before the USDA's payment obligation accrues.[34] The Loan Note Guarantee also includes multiple promises, orders, obligations and powers, including the Lender's option to repurchase the guaranteed portion of the loan, the Lender's required consent to repurchase by the USDA of the guaranteed portion of the loan, the USDA's right of repurchase, the USDA's right to set off against the Lender for payments to the Holder, and the Lender's option to retain or sell the unguaranteed portion of the loan.[35] Because the Loan Note Guarantee does not contain an unconditional promise to pay a sum certain and contains additional promises, orders, obligations and powers, it does not qualify as a Negotiable Instrument under the Bond.

The Assignment Guarantee Agreement for the OHM loan mirrors the Loan Note Guarantee, including the conditions that must be satisfied for payment of the guarantee by the USDA, the Lender's option to repurchase, the Lender's required consent to repurchase by the

---

[33] *See* OHM Loan Note Guarantee at paragraph 8 (USDA Purchase).
[34] *Id*. For this reason the USDA's payment obligation also is not "payable on demand or at a definite time" as required under sub-paragraph (3) of the definition of a Negotiable Instrument.
[35] *Id*. at paragraphs 7 (Repurchase by Lender), 8 (USDA Purchase), 9 (Lender's Obligations), 10 (Repurchase by Lender Servicing), and 11 (Custody of Unguaranteed Portion).

USDA, the USDA's right of repurchase, the USDA's right to set off, and Lender's option to retain or sell the unguaranteed portion of the loan.[36] Because the Assignment Guarantee Agreement does not contain an unconditional promise to pay a sum certain and contains additional promises, orders, obligations and powers, it does not qualify as a Negotiable Instrument under the Bond.

The remaining transactions include substantially identical Term Notes, Loan Note Guarantees, and Assignment Guarantee Agreements.[37] Whether considered individually or collectively, the Term Notes, Loan Note Guarantees, and Assignment Guarantee Agreements for each of the loans do not qualify as Negotiable Instruments under the terms of the Bond. Therefore, Harvard cannot satisfy its burden of proof of the existence of a Negotiable Instrument as required for coverage under Insuring Agreements D(1) and D(3) of the Bond. Security National is therefore entitled to summary judgment on Counts I and II of Harvard's First Amended Complaint seeking a declaration of coverage under Insuring Agreements D(1) and D(3), and Counts I and II of Security National's Second Amended Counterclaim seeking a declaration of no coverage under Insuring Agreements D(1) and D(3).

   **B.**   **There is No Coverage Under Insuring Agreements D(3) and E(3) of the Bond**

In addressing the same or substantially similar language to that in Insuring Agreements D(3) and E(3) of the Security National Bond regarding a "Counterfeit," the Seventh Circuit and courts across the country uniformly hold that for a document to be a counterfeit there must be an authentic, original instrument that the alleged counterfeit document attempts to imitate. For example, in *North Shore Bank, FSB v. Progressive Cas. Ins. Co.*, 674 F.3d 884 (7th Cir. 2012),

---

[36] *See* OHM Assignment Guarantee Agreement at paragraphs 7 (Repurchase by Lender (Defaults)), 8 (Purchase by USDA), 9 (Lender's Obligations), 10 (Repurchase by Lender Servicing), and 11 (Custody of Unguaranteed Portion).
[37] *See* Group Exhibits B through Z to the Pennant First Amended Complaint, copies of which are included in Exhibit 3 to the Snow Affidavit.

12

interpreting the term "counterfeit," the court held that the "bond is intended to cover the risk of reliance on an imitation of a genuine document; it is not intended to cover the risk of reliance on a document that purports to be something that has never existed." *Id*. at 889. The rationale for coverage based on this understanding of "counterfeit" is:

> An insured bank is not covered for mere loan losses resulting from a failure to follow sound business practices, since a bank can easily verify through minimal investigation if a fake document purports to be something that never was in existence. On the other hand, verifying the authenticity of a duplicate or imitation of a genuine document is unlikely to result in discovery of the fraud, a risk an insured bank cannot control.... If a bank ... chooses not to follow sound business practices and fails to investigate, verify, examine, or even possess securities before remitting loan proceeds, it cannot successfully claim this is an insured risk and not an ordinary business loss.

*Id*. at 888 (citing *Nat'l City Bank v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171, 179 (Minn. 1989)).

In *North Shore Bank*, a bank's customer applied for a loan to finance the purchase of a motor home from the dealership the customer owned. To secure the loan, the customer presented the motor home's certificate of origin to the bank as collateral. When the customer defaulted on the loan, the bank discovered that the certificate of origin was a fake and that the motor home did not exist. 674 F.3d at 885-86. In seeking coverage under the bond, the bank argued that the certificate was an imitation of an actual, valid certificate of origin. *Id*. at 888. The court held that this argument missed the mark – while the certificate of origin may have imitated other certificates of origin in general, it did not imitate an actual, original certificate of origin for the motor home the customer was purchasing because the motor home never existed and the manufacturer never produced a motor home with that referenced identification number. *Id*. The court concluded that the "certificate of origin is a complete fabrication and does not correspond to any actually existing certificate of origin or motor home. And without an actual, original certificate of origin, [the

customer's] fraudulent certificate cannot be an imitation of 'an actual, valid Original,' and thus cannot qualify as a 'Counterfeit' under the terms of the bond." *Id*.

In *Capitol Bank*, *supra*, the bank claimed that fake invoices used to secure a loan were counterfeits under the bond. 414 F.2d at 988. The Seventh Circuit disagreed, holding that the fake invoices represented fraudulent, non-existent transactions. *Id*. at 988-89. The court held that "the bank was defrauded because the underlying transaction did not take place rather than by the similarity of the invoices presented to authentic ones" and, therefore, the risk of fraudulent invoices must be borne by the bank. *Id*. at 989 (citing *Exchange Nat'l Bank of Olean v. Ins. Co. of N. Am.*, 341 F.2d 673 (2nd Cir. 1965)).

Harvard's First Amended Complaint in Count II alleges coverage under Insuring Agreement D(3) contending that the term notes were counterfeit. (Doc. #16 ¶¶28-30; 46-48). In Count VI, Harvard alleges that the term notes, guarantees and alleged mortgages were counterfeit certificated securities under Insuring Agreement E. (Doc. #16 ¶¶34-36; 66). Counts II and VI of Security National's Second Amended Counterclaim seek a declaration that the term notes, alleged mortgages and USDA guarantees are not "Counterfeit" under Insuring Agreements D(3) and E(3) of the Bond.

As defined in the Bond, and the case law, to be a "Counterfeit" an enumerated document must be an imitation of an original, authentic and genuine document. Without any admission as to whether any of the alleged documents qualify as a negotiable instrument or a certificated security, Security National submits that as a matter of law none of the documents alleged by Harvard qualify as a "Counterfeit."

It is undisputed that there were no actual, valid original documents that were the subject of the FFF fraud. In reporting the claim under the Bond, Harvard stated that the FFF loans contained

14

signatures of non-existent borrowers. In its sworn Proof of Loss, Harvard confirmed that the borrowers on the loans were non-existent and that the collateral documents for the loans were also non-existent. Harvard's Proof of Loss also adopted the allegations of its investment advisor, Pennant, which had determined that none of the borrowers in the FFF loans existed and that there were no actual loans. Any identifying information for the loans, including postal addresses, either did not exist at all or had nothing to do with the purported borrower. Further, the USDA confirmed that there were no USDA actual, authentic and genuine guarantees in existence for the loans or the properties.

Like in *North Shore*, the sham FFF loans may have imitated in general other similar type mortgages, notes or USDA guarantee documents, but they did not imitate actual, authentic, original mortgages, notes or USDA guarantees corresponding to the specific borrowers and properties identified. The FFF loan related documents, and the loans themselves were complete fabrications and do not correspond to any actual loans for these borrowers and properties. Just like in *Capital Bank*, Harvard was defrauded because the underlying transactions never took place rather than by the similarity of the loan documents to authentic documents. Without actual, original loans, the fraudulent loans cannot be an "an imitation which is intended to deceive and to be taken as an Original" and, thus, cannot qualify as a "Counterfeit" under the terms of the Bond.

Cases outside the Seventh Circuit have reached the same result. In *Dakota West Credit Union v. CUMIS Ins. Soc'y, Inc.*, 532 F. Supp. 2d 1110 (D.N.D. 2008), the court joined the "consistent line of authority" in interpreting a definition of counterfeit identical to the Bond definition in this case. The bank issued a loan based on collateral consisting of a "buyer's bill" representing the customer's purchase of 1,276 steers. *Id*. at 1111-12. The "buyer's bill" was fake. The customer had obtained a blank copy of a genuine "buyer's bill" and filled it out with false

information about a non-existent transaction -- the purchase of 1,276 non-existent steers. *Id*. Aligning itself with "the majority rule," the district court concluded that a document is only a counterfeit "if it is an imitation of or attempts to simulate another document that is authentic." *Id*. at 1116. Because there never was a preexisting genuine "buyer's bill" confirming the customer's purchase of 1,276 steer, the court held, as a matter of law, that the fake buyer's bill was not a counterfeit. *Id*. at 1117.[38]

Courts recognize that the counterfeit definition distinguishes between two possible scenarios: one where a bank receives an imitation of an authentic original document; and one where the bank receives a document created out of whole cloth whose contents are false and represents a fictitious, non-existent transaction. By defining counterfeit as "an imitation which is intended to deceive and to be taken as an Original," counterfeit coverage is strictly limited to the first scenario -- imitations of actual authentic original documents involving the specified transaction. The basic rationale of the counterfeit definition recognizes that an insured bank retains the risk that documents supplied by a customer may be wholly fake and represent non-existent transactions. *Dakota West*, 532 F. Supp. 2d at 1116. *See also Nat'l City*, 447 N.W.2d at 179 ("The

---

[38] The list of other courts that have reached the same result is long and consistent. *See, e.g., F.D.I.C. v. Fidelity and Deposit Co. of Maryland*, 827 F.Supp. 385, 394-95 (M.D. La. 1993) (as collateral borrower submitted fake city ordinance granting a cable television franchise; court held that the fake ordinance did not imitate any original city ordinance because no such ordinance existed); *Reliance Ins. Co. v. Capital Bancshares, Inc./Capital Bank*, 685 F. Supp. 148, 150-51 (N.D. Tex. 1988), *aff'd* 912 F.2d 756 (5th Cir. 1990) ("The courts have consistently held that to be counterfeit under a … Bond, the allegedly counterfeit instrument must be an imitation of an actual existing (or previously existing) original genuine document."); *Nat'l City Bank*, 447 N.W.2d at 178-79 (to be a counterfeit there must be an original valid instrument that the alleged counterfeit document attempted to imitate); *Gateway State Bank v. North River Ins., Co.*, 387 N.W.2d 344, 348 (Iowa 1986) (a counterfeit as defined in the standard bankers bond "requires the document or writing simulate another document that is authentic."); *Liberty Nat'l Bank v. Aetna Life & Cas. Co.*, 568 F. Supp. 860, 863-64 (D.N.J. 1983) (same); *William Iselin & Co. v. Fireman's Fund Ins. Co.*, 501 N.Y.S.2d 846, 850 (N.Y.App.Div. 1986), *aff'd as modified*, 69 N.Y.2d 908 (N.Y. 1987) (same); *Richardson Nat'l Bank v. Reliance Ins. Co.*, 491 F. Supp. 121, 122-23 (N.D. Tex. 1977) ("There were no original instruments and accordingly the MSOs did not imitate, but [were] created."); *Bank of the Southwest v. Nat'l Sur. Co.*, 477 F.2d 73, 76-77 (5th Cir. 1973) (a fake "white slip" -- a Tax Collector's Receipt for Title Application -- was not a counterfeit because it was not an imitation of a genuine "white slip"); *Exchange National Bank of Olean*, 341 F.2d at 676 (counterfeit instrument must be an imitation of an actual existing original genuine document).

basic rationale behind the definition of counterfeit" allocates to the insured bank the risk of extending credit based on collateral documents which misrepresent financial transactions).

Accordingly, documents which are not imitations of an authentic document regarding an existing transaction are not counterfeit because they do not imitate actual, existing original documents. It is not enough that the bank lost money on a loan it issued based on fake documents or instruments representing collateral for the loans, or that the documents appeared to be genuine. What matters is whether the fake documents are imitations of actual, existing and genuine original documents.

Every document created by FFF was wholly fraudulent identifying non-existent entities and transactions. The borrowers identified in the documents do not exist nor was there any loan transaction involving FFF and the stated borrowers and the identified property. The term notes, alleged mortgages, and USDA guarantees were created out of whole cloth. Accordingly, the fake term notes, alleged mortgages and USDA guarantees are not Counterfeit because they do not imitate actual, authentic and genuine original contracts or guarantees involving the transactions identified. Security National is thus entitled to partial summary judgment in its favor as a matter of law.

WHEREFORE, Security National Insurance Company respectfully requests that this Court enter an order granting its Motion for Partial Summary Judgment declaring:

(1) There is no coverage under Insuring Agreements D(1) of the Bond for any of Harvard's alleged losses, so that Security National is entitled to summary judgment on Count I of Harvard's First Amended Complaint (Doc. #16) and on Count I of its Second Amended Counterclaim (Doc. #31);

  (2) There is no coverage under Insuring Agreements D(3) of the Bond for any of Harvard's alleged losses, so that Security National is entitled to summary judgment on Count II of Harvard's First Amended Complaint (Doc. #16) and on Count II of its Second Amended Counterclaim (Doc. #31);

  (3) There is no coverage under Insuring Agreements E(3) of the Bond for any of Harvard's alleged losses, so that Security National is entitled to summary judgment on Count VI of Harvard's First Amended Complaint (Doc. #16) and on Count VI of its Second Amended Counterclaim (Doc. #31); and

  (4) For such other and further relief as this Court deems just and appropriate.

           SECURITY NATIONAL INSURANCE COMPANY

         By: */s/ John K. Daly*
           One of its attorneys

Philip R. King (pking@cozen.com)
John K. Daly (jdaly@cozen.com)
Le Trieu (ltrieu@cozen.com)
COZEN O'CONNOR
123 N. Wacker Dr., Suite 1800
Chicago, IL 60606
Telephone: (312) 474-7900
Facsimile: (312) 474-7898