**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HARVARD SAVINGS BANK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 15 CV 11674 |
| | ) | |
| v. | ) | Hon. Charles R. Norgle |
| | ) | |
| SECURITY NATIONAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Charles R. Norgle, United States District Judge

This collateral lawsuit is a fragment of a $179 million Ponzi scheme. Harvard Savings

Bank and Harvard Illinois Bancorp, Inc. (collectively, "Plaintiff") lost about $18 million by

investing in the scheme. Plaintiff now seeks to recover $3 million from its insurance provider

Security National Insurance Company ("Defendant"), who has declined coverage for the loss.

Before the Court is Defendant's motion for summary judgment. For the following reasons, the

motion is denied.

## I. BACKGROUND

### A. The Fraud Scheme

Three people orchestrated the $179 million fraud scheme: Nikesh A. Patel[1] ("Nikesh");

Timothy G. Fisher ("Fisher"); and Nikesh's wife, Trisha Patel ("Trisha"). Before they devised

and implemented the scheme, Nikesh and Fisher worked together at a bank in Florida. At this

bank, the two men worked on loans administered under the United States Department of

---

[1] Nikesh pled guilty to five counts of wire fraud in violation of 18 U.S.C. § 1343. United States v. Patel, No. 14-CR-546, Dkt. 66 (N.D. Ill. Dec. 6, 2016). The Court takes judicial notice of the records in that case pursuant to Federal Rule of Evidence 201, and gleans many of the factual details of the fraud scheme from Nikesh's plea declaration.

Agriculture's ("USDA") Rural Development loan programs. During the same time, Trisha

worked at a private consulting company that aided businesses in obtaining loans under the

USDA's loan programs. Fisher later went to work for Wells Fargo Bank. Building on their

experiences in the financial sector, Nikesh and Fisher created a company called First Farmers

Financial, LLC ("First Farmers"), and Trisha was named the Assistant Vice President of the

company.

      The Rural Development arm of the USDA "has a $216 billion portfolio of loans" and it

expects to "administer $38 billion in loans, loan guarantees and grants through [its] programs in

the current fiscal year." United States Department of Agriculture Rural Development, *About RD*,

https://www.rd.usda.gov/about-rd (last visited June 9, 2017). One of its loan programs, the

Business and Industry Guaranteed Loan Program, "bolsters the availability of private credit by

guaranteeing loans for rural businesses." United States Department of Agriculture Rural

Development, *Business & Industry Loan Guarantees*, https://www.rd.usda.gov/programs-

services/business-industry-loan-guarantees (last visited June 9, 2017). Under this program,

approved private lenders can issue loans to individuals, for-profit businesses, non-profit entities,

public entities, and others for a wide-variety of uses. The loan funds are meant to be used in

ways that help businesses purchase assets, improve operations and create jobs. Certain

exclusions apply, for example, the funds cannot be used for golf courses or gambling facilities.

The USDA guarantees a portion of the loans originated by private lenders; the guaranteed

portion depends on the size of the loan.

      To reflect First Farmers' financial stability and using his banking experience, Fisher

created financial documents that looked authentic and genuine for the company, but were fake.

Patel and Fisher then submitted the falsified documentation to the USDA to become a certified

non-traditional lender of USDA-guaranteed loans. Beginning in March 2012, First Farmers began issuing what appeared to be loans originated under the USDA's Business and Industry Loan Guarantee Program. By September 2014, First Farmers originated twenty-six loans— seventeen loans to companies located in Georgia and nine loans to companies located in Florida. The loans ranged in amount from $2,500,000 to $10,000,000, and the USDA appeared to guarantee seventy, eighty or ninety percent of each loan. However, it was later discovered that these loans were completely fake—First Farmers never actually lent money to any borrowers.

Each package of fake loans consisted of five separate documents; each document appeared to be a legitimate contractual document on its face. One document was the "Term Note," which appeared to define the terms of the loan from First Farmers to the borrower or "Maker," and it referenced a fourteen digit "USDA Loan Identification Number." A second document called the "Loan Note Guarantee" defined the terms in which the USDA appeared to guarantee a portion of the loan. A third document titled "Assignment Guarantee Agreement" appeared to assign the loan to a third-party bank designated as the "Holder." A fourth document was the "Loan Originator's Letter of Attestation" in which Nikesh would sign as the officer of First Farmers certifying that the loan information was "true and correct" and that no First Farmers employee knew of "any fraud or misrepresentation with respect to the Loan or the assignment of a portion of the loan to the holder of this Attestation." The fifth document was the "Confirmation of Settlement" in which First Farmers summarized the loan terms and stated when the transaction purportedly occurred.

The two critical problems with these loans were that the companies represented as borrowers did not exist and the USDA never guaranteed a portion of the loans. All of the borrowers on the Term Notes appeared to be limited liability companies registered in either

3

Georgia or Florida, but the names were fictitious and no business had actually been created or registered with the Secretary of State for Georgia, Florida or any other state. The fraudsters (who according to the documents were lending the money as First Farmers) simply made up the names of the borrowing companies (who according to the documents were receiving the money) and their respective managing members, and then signed the loan documents themselves as the lender and the borrowers. That was the first problem.

The Loan Note Guarantees and the Assignment Guarantee Agreements contained the signatures of the respective State Director for the USDA at the time—Quinton Robinson for the State of Georgia and Joseph M. Mueller for the State of Florida. These signatures, however, were forged. The State Directors for the USDA never signed these documents, the USDA never guaranteed these loans, the USDA never had any records indicating that these loans existed, and the USDA had no knowledge of the loans until they were uncovered as fakes. Nonetheless, the fictitious loan guarantees from the USDA made the loan packages much more attractive to potential investors on the secondary market and were the driving force behind the feasibility of the fraud. That was the second problem.

First Farmers realized actual pecuniary gain from the scheme when it sold "Guaranteed Portions of USDA B&I Loans and all supporting agreements, documents and instruments[,]" which included the "applicable promissory notes underlying such Loan Note Guarantees…" to Pennant Management, Inc. [2] ("Pennant") for a total of $179,160,000.00. Third Am. Compl., Ex. AA at 23, Pennant Mgmt., Inc. v. First Farmers Fin., LLC, No. 14-CV-7581, Dkt. 1132-4 at 23 (hereinafter "Pennant's Complaint"). Pennant was a Registered Investment Advisor as defined

---

[2] Pennant also filed a lawsuit directly against First Farmers and its affiliated companies in an effort to recover assets to compensate the victims of the fraud. Pennant Mgmt, Inc. v. First Farmers Fin., LLC, No. 14-CV-7581 (St. Eve, J.). Both parties have submitted copies of First Farmer's fraudulent loans that they adopted from the Pennant case. The Court takes judicial notice of the record in that case pursuant to Federal Rule of Evidence 201.

4

by the Investor Advisor Act of 1940, it was located in Illinois, and it marketed itself as "a leading purchaser of USDA-guaranteed Rural Development Business & Industry Loans." Pennant's Complaint ¶ 28. At one time, Pennant managed loans with an aggregate value of $850,000,000 on behalf of its clients. Pennant's clients were typically community banks (like Plaintiff), retirement plans, municipalities, and labor unions. To fund the $179 million purchase, Pennant solicited its clients. Plaintiff invested $18,084,796.74—about a ten percent share.

Pennant first noticed "inconsistencies" in the loan documents during a routine review in September 2014. Pennant's Complaint ¶ 36. Pennant followed up with the USDA, which confirmed that it had no record of the loans and never guaranteed the loans. The USDA denied Pennant's claim for recovery on the fraudulent loans. In its Third Amended Complaint, Pennant aptly summarizes the fraud scheme in one sentence: "Together, [Nikesh, Trish and Fisher] invented each of these 26 'borrowers' out of whole cloth, printed phony loan documents, forged the signatures of USDA officials on guarantees, and sold worthless paper to Pennant for $179,160,000.00." Pennant's Complaint ¶ 46.

**B. The Financial Institution Bond**

In June 2014, Plaintiff purchased a "Financial Institution Bond" (the "Bond") from Defendant.[3] The Bond covered Plaintiff for a period of three years at a premium of $27,085. The Bond insured Plaintiff for a multitude of losses, such as losses incurred because of counterfeit currency, destruction of data or programs by hackers, check kiting schemes, even kidnapping and extortion. The deductible varied depending on the type of loss, but was typically $35,000. The loss limits also varied, but was typically $3,000,000. At issue in this decision is the Bond's

---

[3] The Bond is the Surety Association of America's Standard Form 24. It is the most common bankers blanket bond and "has a well-chronicled history." Universal Mortg. Corp. v. Wurttembergische Versicherung AG, 551 F.3d 759, 761 (7th Cir. 2011). "Over the last century, nearly every term in the Form 24 bond has been developed in reaction to court interpretations of prior versions of the bond." Id.

Section D: "Forgery and Alteration" and Section E: "Securities[,]" which have the deductible amount and loss limit previously mentioned.

Under Section D, two provisions are relevant—Subsections One and Three. Under those provisions Plaintiff is insured for a direct loss from: "Forgery or alteration of, on, or in any Negotiable Instrument…" or "the receipt by the Insured, in good faith, of any Counterfeit Negotiable Instrument." And the Section E clause relevant to this decision insures Plaintiff for a "[l]oss resulting directly from the Insured having, in good faith, for its own account or for the account of others, acquired, sold or delivered, given value, extended credit or assumed liability on the faith of a [Certificated Security][4] which is Counterfeit."

The Bond defines "Forgery," "Negotiable Instrument" and "Counterfeit." "Forgery means the signing of the name of another person or organization with intent to deceive…." Next, "Negotiable Instrument means any writing (1) signed by the maker or drawer, and (2) containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer, and (3) is payable on demand or at a definite time, and (4) is payable to order or bearer." Third, "Counterfeit means an imitation which is intended to deceive and to be taken as an Original." And because Original is also defined by the Bond, the Court restates it here: "Original means the first rendering or archetype and does not include photocopies or electronic transmissions even if received and printed." Because the parties do not dispute the interpretation of Certificated Security, the Court does not restate or address the Bond's definition of it.

---

[4] Plaintiff claims that it invested in a Certificated Security; Defendant does not contest Plaintiff's classification of the $18 million investment in its motion for summary judgment.

## C. The Procedural History

On September 29, 2014, Pennant informed Plaintiff of the miserable news that Pennant had invested Plaintiff's $18 million in a Ponzi scheme. Plaintiff submitted a claim for the loss to Defendant on October 17, 2014, and over a year later, Defendant denied the claim on November 24, 2015. About a month passed before Plaintiff filed a complaint for declaratory judgment, pursuant to the Court's diversity jurisdiction under 28 U.S.C. § 1332, seeking reimbursement under the Bond. Plaintiff amended its complaint in February 2016, to set forth six specific provisions that it alleges provide coverage under the Bond—Sections D(1), D(3), E(1), E(3), Q, and V—and one general breach of contract claim. Defendant filed an answer and a counterclaim. The counterclaim essentially mirrors Plaintiff's amended complaint, but contends that interpretation of these sections in the Bond turn in Defendant's favor.

The parties have since settled their dispute regarding Sections Q and V of the Bond. The Court also previously questioned whether this case should be reassigned to Judge St. Eve based on this case's relatedness to Pennant's case, and whether the case should be transferred to the Western Division, where Plaintiff is located. After considering the parties' positions, however, the Court answered both questions in the negative. The Court now turns to adjudicating Defendant's motion. In its motion for partial summary judgment, Defendant argues for judgment in its favor on Sections D(1), D(3), and E(3). Whether Plaintiff has insurance coverage under Section E(1) and whether Defendant breached the terms of the Bond are issues that await resolution another day.

7

## II. DISCUSSION

### A. Standard of Decision

At the summary judgment stage, the Court views the record in the light most favorable to the nonmoving party and construes all reasonable inferences in its favor. Hart v. Mannina, 798 F.3d 578, 584 (7th Cir. 2015) (citation omitted). "[A] court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). "Summary judgment is appropriate only where there are no genuine issues of material fact and the moving part[y is] entitled to judgment as a matter of law." Hart, 798 F.3d at 584 (citing Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted).

### B. Interpretation of the Bond

The Bond, like any insurance policy, is a contract, and the general rules of contract interpretation apply. Hobbs v. Hartford Ins. Co. of the Midwest, 823 N.E.2d 561, 654 (Ill. 2005).[5] "[T]he court must construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." Nicor, Inc. v. Assoc. Elec. & Gas Ins. Servs. Ltd., 860 N.E.2d 280, 286 (Ill. 2006). The primary objective of the Court "is to ascertain and give effect to the intention of the parties, as expressed in the policy language." Hobbs, 823 N.E.2d at 654. Ambiguities in the policy are interpreted in favor of the insured; otherwise, words are given their plain and ordinary meaning unless doing so

---

[5] Because this is an action under diversity jurisdiction and the contract was entered into in Illinois, the Court applies the substantive laws of Illinois. Capitol Bank of Chicago v. Fid. and Cas. Co. of New York, 414 F.2d 986, 987 (7th Cir. 1969) (citing Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)).

would violate public policy. Nicor, Inc., 860 N.E.2d at 286. "[T]he burden is on the insured to prove that its claim falls within the coverage of an insurance policy." Addison Ins. Co. v. Fay, 905 N.E.2d 747, 752 (Ill. 2009). After coverage is established, the burden shifts to the insurer to show an applicable exclusion or limitation to coverage. Id.

The Declarations page of the Bond lists twenty-four different types of financial losses that are insured, the majority of which are losses related to fraud crimes. The Bond also includes several additional Riders that provide supplemental coverage. Plaintiff paid a substantial premium for the insurance coverage, Plaintiff must typically pay a substantial deductible in the event of a loss, and the loss is limited to a maximum of $3,000,000 per incident. The overall purpose of the Bond is to insure Plaintiff, a bank, if it becomes the victim of an unforeseen financial crime. Speaking about the bankers blanket bond, the Third Circuit has aptly stated that "[t]he bond itself contains a great many words and covers a great many subjects." Fid. Trust Co. v. Am. Sur. Co. of New York, 268 F.2d 805, 806 (3rd Cir. 1959). But, the dispute in this motion for summary judgment, and the heart of this case, arises over the interpretation of three provisions in the Insurance Bond that Plaintiff purchased.

## C. Coverage Under D(1)

Section D(1) of the Bond provides insurance coverage for Plaintiff in the event of "Forgery or alteration of, on, or in any Negotiable Instrument." Defendant does not argue that a forgery or alteration did not occur, nor could it, given that each of the loan guarantees contains the forged signature of a USDA official. Instead, Defendant contends that neither the Term Notes nor the particular documents that contain the forgeries, the USDA guarantees, fall within the Bond's definition of a "Negotiable Instrument."[6]

---

[6] Neither party has presented a case from Illinois, the Seventh Circuit, or the Northern District of Illinois that interprets the D(1) provision of the bankers' blanket bond. The Court's own research, however, reveals a case in

It has been longstanding in Illinois that "[n]egotiability is favored in the law." Bank of Viola v. Nestrick, 290 N.E.2d 636, 639 (Ill. App. 1979). Illinois is a state that has adopted the Uniform Commercial Code ("UCC"), under which a negotiable instrument can take several forms—it can be a draft, a check, a note, or a certificate of deposit. See 810 ILCS 5/3-104. Negotiable instruments are a special class of contracts and need to meet certain standards beyond merely being transferrable. Id. The Court does not consider extrinsic evidence when determining negotiability of an instrument because "if the document on its face fulfills the requirements for negotiability set forth in U.C.C. 3-104 (Ill.Rev.Stat.1975, ch. 26, par. 3-104), it is prima facie a negotiable instrument." Leopold v. Halleck, 436 N.E.2d 29, 32 (Ill. App. 1982); see also Manufacturers Hanover Trust Co. v. Frymire, No. 86 C 2440, 1991 WL 274972, at *4 (N.D. Ill. Dec. 17, 1991) ("If a document fulfills the requirements for negotiability on its face as set forth in UCC § 3–104, it is prima facie a negotiable instrument.").

The Court construes documents as a single agreement where the documents were executed at the same time. Krilich v. Millikin Mortg. Co., 554 N.E.2d 422, 426 (Ill. App. 1990) ("When a negotiable instrument is executed at the same time as another writing, they must be read together as a single agreement."); Cmty. State Bank of Galva, 542 N.E.2d at 1320 ("instruments executed for the same purpose and in the course of the same transaction will be construed as a single instrument"). Here, the five separate documents were all executed as a single purported transaction, the guarantees would not exist with a promissory note to guarantee and the notes and loan guarantees were sold as a combined asset. Thus, to determine whether the loan packages were negotiable in this case, the Court construes them as a single agreement.

---

which a comparable forgery scheme occurred, and the Illinois appellate court affirmed insurance coverage for a bank that purchased a blanket bond with a similar forgery provision. See Cmty. State Bank of Galva v. Hartford Ins. Co., 542 N.E.2d 1317 (Ill. App. 1989).

The Bond in this case has defined "Negotiable Instrument" similarly to the UCC definition. It is defined as: "any writing (1) signed by the maker or drawer, and (2) containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer, and (3) is payable on demand or at a definite time, and (4) is payable to order or bearer." The four requirements of negotiability as defined by the Bond are unambiguous and do not offend Illinois' public policy, so the Court applies the plain and ordinary meaning of the definition.

First, the Term Notes are all signed by a maker (although extrinsic evidence shows that the makers did not actually exist). Second, the beginning clause of the Term Notes states that the maker "promises to pay to [the order or bearer]...the principal sum of [a certain amount of money]." Each maker's promise to pay is not conditioned on any act or occurrence, and the sum to be paid is certain—the loan amount plus interest. Third, the sum certain is payable at a definite time—monthly for 360 months. And the last requirement is met because the loans are payable to order or bearer—First Farmers and the subsequent holders of the Term Notes. The Court finds that the four requirements of negotiability are all met; therefore, the loan packages sold by First Farmers qualify under the Bond definition of "Negotiable Instruments." Because it is uncontested that there were forgeries in the loan packages, the Court finds that Plaintiff has established insurance coverage under Section D(1).

"Once the insured has demonstrated coverage, the burden then shifts to the insurer to prove that a limitation or exclusion applies." Addison Ins. Co., 905 N.E.2d at 752. Defendant does not contend that a separate limitation or exclusion applies. Instead, Defendant focuses its defense on the "unconditional promise" requirement of the negotiable instrument definition. Defendant refers to several provisions within the Term Notes and classifies the provisions as

"promises, orders, obligations and powers," but Defendant reaches this conclusion without any citation to case law, statute or legal authority. The provisions referenced by Defendant apply to repayment, affiliated taxes and default; they are not conditions on the maker's promise to pay.

Furthermore, Defendant contends that the Loan Note Guarantees and the Assignment Guarantee Agreements have conditions, so they cannot be negotiable instruments. But in making this argument, Defendant glosses over the requirement that any "other promise, order, obligation or power [must be] given by the maker or drawer." The guarantees reference the Term Notes, but they are agreements between First Farmers and the USDA; the makers are not parties or signatories to the guarantees. The Court rejects Defendant's broad, unsupported arguments, which would in effect make ordinary and traditional loans nonnegotiable simply because the notes contain thorough provisions addressing repayment, taxes, default, or contain a separate loan guarantee.

In its reply brief, Defendant raises new arguments and cites new case law to address Plaintiff's position regarding negotiability. None are persuasive. Defendant's new arguments are detached from the facts of this case. For example, Defendant contends that Plaintiff only invested in the guaranteed portions of the loans, but that argument disregards that Pennant purchased "all supporting agreements, documents and instruments[,]" which included the "applicable promissory notes." Moreover, the case law cited by Defendant is either: (1) not controlling; (2) applies the law from a state other than Illinois; (3) does not address the Bond definition of Negotiable Instrument; or (4) is a combination of the three preceding deficiencies. Therefore the Court finds that Defendant fails to meet its burden of showing a reason why Plaintiff's loss is not covered under Section D(1).

**D. Coverage Under E(3)**

Section E(3) covers four types of securities, and insures Plaintiff if it purchased a "Counterfeit." Plaintiff claims that its purchase of an interest in the fraudulent loan packages qualifies as a "Certificated Security," which Defendant does not dispute. Defendant instead disputes whether the loan packages themselves qualify as "Counterfeit." As previously mentioned, the Bond defines Counterfeit as "an imitation which is intended to deceive and to be taken as an Original." To support its position,[7] Defendant argues that the fake loans cannot be counterfeit because no authentic, original loans existed, and it relies primarily on two Seventh Circuit opinions: Capitol Bank of Chicago v. Fid. & Cas. Co. of New York, 414 F.2d 986 (7th Cir. 1969) and North Shore Bank, FSB v. Progressive Cas. Ins. Co., 674 F.3d 884 (7th Cir. 2012). The Court finds that these cases are distinguishable, and that there is a genuine issue whether the loan packages qualify as "Counterfeit."

The Seventh Circuit decided Capitol Bank before the Standard Form 24 version of the bankers blanket bond was written, and the bond reviewed in Capitol Bank did not define counterfeit. 414 F.2d at 987. Relying on precedent from the Second and Tenth Circuits, the Capitol Bank court fashioned its own definition for counterfeit: "the imitation of an instrument that is authentic such that a party is deceived on the basis of the quality of the imitation." Id. at 989. Because the Capitol Bank definition of counterfeit varies from the definition of "Counterfeit" in the Bond here, the Court finds the case instructive but not controlling.

---

[7] Once again, neither party has cited a case from Illinois, the Seventh Circuit, or the Northern District of Illinois that has interpreted the provision of the blanket bond that is relevant here, E(3). During its research the Court discovered a case where the plaintiff was insured under "a policy known as a Bankers Blanket Bond against losses resulting from acceptance or purchase of forged or counterfeited business securities, documents, or other written instruments." Central Nat. Chicago Corp. v. Lumbermens Mut. Cas. Co., 359 N.E.2d 797, 800 (Ill. App. 1977). In Lumbermens Mutual, the appellate court affirmed the trial court's finding that the plaintiff was insured for a loss it suffered because it relied on fabricated accounts "supported by forged and fraudulent bills of lading and government inspection report forms." Id.

In <u>North Shore</u>, the fake document underlying the transaction was a fabricated certificate of origin for a motor home. 674 F.3d at 885. When the loan on the motor home was not paid and the collateral did not exist, the bank sought reimbursement from its insurer on the basis that the certificate of origin was a counterfeit. <u>Id.</u> <u>North Shore</u> does not control the outcome of this case for two reasons. The first reason is that in <u>North Shore</u> the laws of Wisconsin applied, not Illinois. <u>Id.</u> at 887. Second, the definition of counterfeit in North Shore Bank's insurance policy materially differs from the definition in Plaintiff's Bond. North Shore Bank's policy defined counterfeit as "'a Written imitation of <u>an actual, valid</u> Original which is intended to deceive and to be taken as <u>the</u> Original.'" <u>Id.</u> at 886-87 (emphasis added). The definition "Counterfeit" in North Shore is much more restrictive than the definition *sub judice*.

Plaintiff's reference to the Chicago Manual of Style to explain the difference between a writer's use of "the" versus "a" is persuasive. <u>See</u> Chicago Manual of Style at § 5.68. "The" is a definite article that refers to a single specific thing. <u>Id.</u> at § 5.69. Whereas, "a" is an indefinite article that is nonspecific and refers to any member of a class. <u>Id.</u> at § 5.70. The difference is vital here because there were of course no actual, valid loan packages for the twenty-six fake borrowers; but that is not a requirement of Plaintiff's Bond. The Bond here only requires <u>an</u> imitation of <u>an</u> original. It is undeniable that the fake loan packages were intended to deceive, even Nikesh admitted that. The genuine issue of material fact is whether the fake loans are imitations that could have been taken as originals. Stated simply, do the fake loans look like a real loan package issued under the USDA's Business & Industry Program? The Court cannot say yet. Plaintiff has not yet moved for judgment in its favor. Lenders originate billions of dollars of loans under the USDA's programs every year, but no party has presented any valid Business and Industry Guaranteed Loans for the Court to determine whether the fake loan packages could "be

taken as an Original." Fact discovery closed after Defendant filed its summary judgment motion, and this narrow issue may still lend itself to resolution short of trial.

When applying the definition of counterfeit, the judicial inquiry should focus on how closely the fake documents look to valid documents, not the actions taken, or not taken, by the victim of the fraud. Blaming the victim's conduct has been a component of judicial decisions in the past, but it is not the best rationale for courts to use when determining the quality of an imitation. See, e.g., Capitol Bank, 414 F.2d at 989 (faulting the bank for not "verify[ing] the existence of the pledged accounts receivable by [] inquiring with the loan applicant's purported customer."); North Shore, 674 F.3d at 886 (commenting that it was "likely that if the Bank had taken certain additional steps it would have discovered [the] fraud before the loan agreement was finalized."); Nat'l City Bank v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171, 179 (Minn. 1989) ("An insured bank is not covered for mere loan losses resulting from a failure to follow sound business practices, since a bank can easily verify through minimal investigation if a fake document purports to be something that never was in existence."); Dakota West Credit Union v. CUMIS Ins. Soc'y, Inc., 532 F.Supp.2d 1110, 1117 (D.N.D. 2008) ("In this case a single phone call by Dakota West to Lake Region Livestock before advancing any loan funds to H & J Livestock would have revealed that H & J Livestock had never purchased steers…If a bank or credit union chooses not to follow sound business practices and fails to investigate, verify examine, or even possess signed sales documentation before remitting loan proceeds, it cannot reasonably claim that the resulting loan loss is an insured risk and not an ordinary business risk."). Regardless of whether these past cases improperly focused on the victim instead of the counterfeit document, this case is also factually distinguishable. Plaintiff was a distant investor in

this scheme. Pennant, the purchaser of the fake loans and investment advisor to Plaintiff, would be the party primarily responsible for verifying the legitimacy of the loans, not Plaintiff.[8]

The Court agrees with the Third Circuit "that common usage would indicate that counterfeit is something that purports to be something that it is not." Fid. Trust Co., 268 F.2d at 806. Therefore, the dispute whether the fake loans were counterfeit ends when the Court determines that the fake loans "looked all right even as to details but they were not what they seemed to be." Id.; see also Capitol Bank, 414 F.2d at 989 (discussing that a factor in determining counterfeit is "the similarity of the [fake] invoices presented to authentic ones"). Plaintiff should submit copies of valid USDA-guaranteed Business and Industry Loans, so the Court can make the determination of whether the fake loans created by First Farmers qualify as "Counterfeit."

**E. Coverage Under D(3)**

Section D(3) provides Plaintiff with insurance coverage when it receives a "Counterfeit Negotiable Instrument" in "good faith." The Court has already discussed the Bond definitions of "Counterfeit" and "Negotiable Instrument" and found that both definitions are applicable to the fraudulent loan packages in this case. Defendant does not argue that Plaintiff did not receive the loan packages in good faith. Therefore, the Court finds that Plaintiff can establish insurance coverage under Section D(3) as well.

### III. CONCLUSION

The Court finds that there is enough evidence in this case that a reasonable jury could return a verdict in Plaintiff's favor. Therefore, Defendant's motion for summary judgment is

---

[8] On the face of these promissory notes, the loans appear to be legitimate contracts, but a quick inquiry with the either Florida or Georgia Secretary of State's office or website would raise serious concerns about the legitimacy of the purported borrowers. Additionally, a phone call or follow up with the USDA would have alerted Pennant that First Farmers' purported loans did not exist.

denied. Plaintiff has established a prima facie case for insurance coverage under Section D(1) of the Bond. However, because discovery had not closed at the time that Defendant filed this motion, Plaintiff has not filed a cross-motion for summary judgment, and Plaintiff has not established that it is entitled to judgment as a matter of law on Sections (D)(3), E(1), or E(3), the Court does not enter judgment at this time.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: June 12, 2017